```
____ FILED      ____ ENTERED
____ LODGED     ____ RECEIVED

       FEB  9 2015

        AT SEATTLE
   CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY                      DEPUTY
```

Magistrate Judge Donohue

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. MJ15-51 |
| Plaintiff, | COMPLAINT FOR VIOLATION |
| v. | 18 U.S.C.§§ 1344 & 1028A(a)(1) |
| CALVIN DEWAYNE DAVIS, | |
| Defendant. | |

BEFORE the Honorable James P. Donohue, United States Magistrate Judge, U.S. Courthouse, 700 Stewart Street, Seattle, Washington.

The undersigned complainant, being duly sworn, states:

### COUNTS 1-3
### (Bank Fraud)

**A.    The Scheme and Artifice to Defraud**

1.    Beginning at a time unknown but not later than April 4, 2013, and continuing until December 24, 2013, in King County, within the Western District of Washington, and elsewhere, CALVIN DEWAYNE DAVIS, along with other persons known and unknown to the United States (the "co-schemers"), devised and executed a

COMPLAINT/DAVIS - 1

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

scheme and artifice to defraud Bank of America, BECU, and Wells Fargo Bank ("Victim Banks"), all of which are financial institutions as defined by Title 18, United States Code, Section 20; and to obtain moneys, funds, credits, assets, and other property under the custody and control of the Victim Banks, by means of materially false and fraudulent pretenses, representations, and promises.

2. The essence of the scheme and artifice to defraud was for the co-schemers use the accounts of customers at the Victim Banks and make intentionally invalid deposits into those accounts, temporarily inflating the balance of available funds. These invalid deposits were material to the Victim Banks because they influenced them to increase the balance of available funds in those accounts, thereby making those funds available for withdrawal, and they would not have done so had the invalidity of the deposits been known. The co-schemers then withdrew funds based on those artificially-inflated balances before the Victim Banks detected the invalidity of the deposits and reversed them, resulting in a loss and risk of loss to the Victim Banks.

**B.  Manner and Means of the Scheme and Artifice to Defraud**

3. It was part of the scheme and artifice to defraud that the co-schemers obtained access to at least 13 customer accounts at the Victim Banks, including accounts belonging to C.S., A.G., and T.O.

4. It was further part of the scheme and artifice to defraud that the co-schemers gained access to these accounts by obtaining means of identification belonging to the true accountholders.

5. It was further part of the scheme and artifice to defraud that the co-schemers deposited and caused to be deposited unauthorized and forged checks into these bank accounts, thereby artificially increasing the balance of available funds in those accounts.

6. It was further part of the scheme and artifice to defraud that after the invalid deposits were made but before their invalidity became apparent, the co-schemers made

and caused to be made withdrawals from those accounts based on the invalid deposits and the artificially increased available-funds balances created thereby.

7.      It was further a part of the scheme and artifice to defraud that the co-schemers failed to repay the sums withdrawn, resulting in loss and a risk of loss to the Victim Banks.

C.      **Execution of the Scheme and Artifice to Defraud**

8.      On or about the below dates, within the Western District of Washington, CALVIN DEWAYNE DAVIS, along with other persons known and unknown to the United States, executed the scheme and artifice to defraud set forth above by knowingly conducting and causing to be conducted the following transactions:

| Count | Date | Transaction |
| --- | --- | --- |
| 1 | 06/06/2013 | Invalid $1,991.11 deposit into C.S.'s Bank of America checking account '0242 |
| 2 | 07/24/2013 | $300.00 withdrawal from A.G.'s Bank of America checking account '0220 following an invalid deposit |
| 3 | 09/05/2013 | $480.00 withdrawal from T.O.'s BECU checking account '5630 following an invalid deposit |

All in violation of Title 18, United States Code, Section 1344.

### COUNTS 4-6
### (Aggravated Identity Theft)

On or about the below dates, within the Western District of Washington, CALVIN DEWAYNE DAVIS did knowingly transfer, possess, and use, without lawful authority, the means of identification of other persons specified below—all of whom were real persons—during and in relation to a violation of Title 18, United States Code, Section 1344, as alleged in Counts 1-3:

| Count | Date | Means of Identification |
|---|---|---|
| 4 | 06/06/2013 | Bank of America debit card number '7376 and PIN of C.S. (Count 1) |
| 5 | 07/24/2013 | Bank of America debit card number '3243 and PIN of A.G. (Count 2) |
| 6 | 09/05/2013 | BECU debit card number '6106 and PIN of T.O. (Count 3) |

All in violation of Title 18, United States Code, Section 1028A(a)(1).

And the complainant states that the Complaint is based upon the following information.

I, MICHAEL SPIESS, being first duly sworn on oath, depose and say:

### INTRODUCTION

1. I am a Special Agent with the United States Secret Service ("USSS") and have been since September 22, 2002. I am currently assigned to the Seattle Field Office. I am a graduate of the Federal Law Enforcement Training Center located in Glynco, Georgia, and the USSS Special Agent Training Program located in Beltsville, Maryland. Before becoming a Special Agent, I was employed with the USSS as a Uniformed Officer in Washington, D.C. Before that, I served as a United States Immigration Inspector in Toronto, Canada. I have a Bachelor of Arts Degree from Daemen College in Amherst, New York. In the course of my official duties as a Special Agent, I have investigated a broad range of financial crimes, including those involving credit card fraud, bank fraud, access device fraud, money laundering, and counterfeit currency and securities. As a result, I have experience with various methods an practices used by criminals to defraud banks and other financial institutions, including through various types of account takeover schemes.

2. This affidavit is based upon my own personal knowledge, my training and experience, and information collected during this investigation through, among other things, witness interviews, law enforcement investigative reports, bank statements and account records, video surveillance footage, and public records. Because this affidavit is submitted for the limited purpose of establishing probable cause, I have not set forth each

1 and every detail of the investigation known to me at present. Instead, I have included
2 only those facts I believe necessary to establish probable cause.

3. Based on my investigation, I believe there is probable cause to conclude that CALVIN DEWAYNE DAVIS committed the offenses charged in this Complaint. Specifically, between April 4, 2013, and December 24, 2013, DAVIS participated in an account takeover scheme known as a "Bank Liq." In a Bank Liq, suspects use legitimate bank accounts to deposit counterfeit or unauthorized (and often stolen) checks. They then make cash withdrawals and/or debit card purchases, drawing down the account balance. The scheme is effective because banks often make some portion of the deposited funds available to the account holder even though it may take a few days for the invalid nature of the check to be detected and the deposit reversed. It is also common for suspects to repeat this process several times before the victim financial institution detects the fraudulent pattern and suspends/closes the account. In order to conceal their activities, Bank Liq perpetrators generally avoid using their own bank accounts. Instead, they use bank accounts in others' names by either stealing account information or, more often, with the assistance of the true account holder. The accounts involved in the instant scheme largely fall into the latter category. It appears many of these account holders were to some degree complicit in the scheme, notwithstanding their statements to the contrary. Though there are a few instances in which the true account holders appear to have been duped into sharing their account information.

4. The account activity associated with a Bank Liq has a distinct pattern. Before it begins, the account balance is often minimal, or even slightly negative. Then begins a series of deposits and subsequent cash advances/debit card purchases and a corresponding series of deposit reversals as the deposited checks are returned once their fraudulent nature becomes apparent.

**SUMARY OF PROBABLE CAUSE**

5. This investigation began in June 2013 when Bank of America security personnel notified the Seattle Field Office of the USSS of a suspected Bank Liq scheme

operating in and around Seattle. Although Bank of America first reported the fraudulent activity, other financial institutions with a presence in Seattle have reported Bank Liq activity involving their accounts and the same suspects involved with the Bank of America accounts. As a result of this investigation, I have identified DAVIS as one of several participants in the scheme. Thus far, I have identified at least 13 Bank of America and BECU accounts that DAVIS (working with others) has used to perpetrate this Bank Liq scheme and traced at least $35,950.16 in losses to DAVIS's fraudulent activity. Each of these compromised accounts displays the hallmarks of a Bank Liq: that is, multiple check deposits, each followed by cash withdrawals/debit card purchases, only to have the checks returned days later as either unauthorized or fictitious and the victim institution unable to recover the funds withdrawn. Each also had a minimal or slightly negative balance at the time the Bank Liq activity began. Indeed, bank records obtained during this investigation show that the balances in many of these accounts were drawn down to near zero just before the first fraudulent checks were deposited.

6. As part of this investigation, I researched DAVIS's criminal history and learned that he has been convicted of Bank Fraud twice before: once in 2008 and again in 2011. In each case, DAVIS's convictions arose from his participation in a Bank Liq scheme like the one alleged here. And at the time he committed the instant offenses, DAVIS was under federal supervision in the District of Oregon following his 2011 bank fraud conviction. DAVIS is currently in custody at FDC SeaTac serving an eight month sentence following revocation of his supervised release in the District of Oregon.

7. In the paragraphs that follow, I detail a portion of the fraudulent activity that occurred in three of the accounts used by DAVIS (and his co-schemers) to execute the Bank Liq. The activity described below gives rise to the charges against DAVIS contained in this Complaint.

### Counts 1 & 4: C.S.'s Bank of America Checking Account '0242

8. As part of this investigation, I obtained records from Bank of America related to checking account '0242, including records of account activity and surveillance footage taken at area banking centers documenting certain account activity. Those records show that C.S. opened this account on May 29, 2012, and that on the day the Bank Liq activity began, the account balance was -$0.02.

9. Deposit records show that on June 5, 2013, someone made a $1,795.01 check deposit into C.S.'s Bank of America checking account '0242 at the Twin Lakes Banking Center in Federal Way. They show another check deposit for $1,991.11 at the South Center Banking Center in Tukwila the following day. Several days later, however, both checks were returned due to a stop payment order and the deposits reversed.

10. As part of this investigation, I obtained Washington DOL records for DAVIS, including his Washington DOL photo. I compared that photo to the surveillance footage documenting the two deposits described above. Based on this comparison, I determined that DAVIS is the person shown in the surveillance footage. I also reviewed records documenting the deposit transactions, which show that in order to make these deposits, DAVIS used C.S.'s debit card with the number ending '7376 and associated PIN.

11. I reviewed copies of the deposited checks and determined that they were drawn on a JP Morgan Chase checking account belonging to K.W. and J.T. On January 30, 2014, I contacted J.T. regarding the activity involving her checks. She stated that her car was burglarized in May 2013 and that the deposited checks had been in her purse at the time it was stolen. J.T. also stated that she did not authorize anyone to deposit those checks into C.S.'s bank account.

12. Account records also show that following each of these deposits (but before the checks were returned to Bank of America), a portion of the deposited funds was withdrawn in a series of cash withdrawals and money order purchases at an area retailer.

13. On June 10, 2013, C.S. filed a fraud claim with Bank of America, stating that the activity on his account was unauthorized. In my experience, it is not uncommon for account holders who have provided their information to the perpetrators of a Bank Liq (often at their direction) to file fraud claims, both to avoid suspicion and in hopes of recovering additional funds from the financial institution.

14. Bank of America suspended the account and ultimately closed it due to the suspected fraud. Bank of America suffered a total loss of $7,665.25 as a result of the Bank Liq activity on this account.

### Counts 2 & 5: A.G.'s Bank of America Checking Account '0220

15. I also obtained account records and surveillance footage related to Bank of America checking account '0220. Those records show that A.G. opened this account on November 18, 2011, and that on the day the Bank Liq activity began, the account balance was $100.35.

16. Deposit records show that on July 24, 2013, someone attempted a $1,925.00 check deposit into that account at a teller window in a banking center in Renton but cancelled the deposit before completion. A few minutes later, however, someone used an ATM at the same banking center to complete a $1,925.00 check deposit into A.G.'s account.

17. I obtained a copy of the deposited check and determined that it was drawn on an American Lake Credit Union account belonging to L.T. of Tacoma. That check was returned two days later because the account had been closed, and Bank of America reversed the deposit. (Public records checks revealed that L.T. passed away on March 16, 2012.)

18. A few minutes after the deposit into A.G.'s account, someone made two ATM cash withdrawals from A.G.'s account totaling $400.00 (one for $300.00 and another for $100.00).

19. As above, I compared the surveillance footage for these transactions to DAVIS's DOL photo and confirmed that DAVIS was the individual responsible for both

the deposit (including the attempt) and withdrawals. Records provided by Bank of America show that in order to complete these transactions, DAVIS used A.G.'s debit card with the number ending '3243 and associated PIN.

20. On January 28, 2014, another agent and I interviewed A.G. concerning the activity in A.G.'s account. A.G. maintained that he had no involvement with this fraudulent activity and stated that before the activity started, he lost his wallet containing both his debit card and the piece of paper on which he had written his PIN. According to A.G., he had written his PIN on a piece of paper because he had trouble remembering it. I showed A.G. some of the surveillance photos depicting DAVIS's use of his debit card and PIN, and A.G. stated that he did not know DAVIS and had not authorized him to access his bank account.

21. Bank of America suspended the account and ultimately closed it due to the suspected fraud. Bank of America suffered a total loss of $400.00 as a result of the Bank Liq activity on this account.

**Counts 3 & 6: T.O.'s BECU Checking Account '5630/Savings Account '5622**

22. I also obtained and reviewed account records and surveillance footage related to BECU checking account '5630 and savings account '5622. According to those records, T.O. opened those accounts on October 31, 2011. Records for these accounts show that on the day the Bank Liq activity began, the account balance was $5.00 for the savings account and $0.78 for the checking account.

23. On September 4, 2013, someone made two check deposits into these accounts at a BECU banking center in Tukwila: one for $2,420.00 into T.O.'s BECU checking account '5630 and the other for $2,380.00 into T.O.'s BECU savings account '5622. Both deposits were ultimately determined to be the product of fraud and later reversed.

24. I obtained copies of the deposited checks and determined that each check was drawn on a Wells Fargo Bank checking account belonging to R.A. As part of an internal fraud investigation, BECU investigator Mitch Mondala interviewed R.A. R.A.

stated that his checkbook (with the deposited checks) was stolen during a car burglary in July 2013. R.A. also stated that he did not authorize anyone to deposit his checks into T.O.'s accounts.

25. Using Washington DOL records, I identified the individual who deposited the checks described above as A.V., an associate of DAVIS. I believe the two are associated because, among other things, I have identified at least one other account in which A.V. and DAVIS engaged in Bank Liq activity. Moreover, according to other law enforcement agents, at the time of DAVIS's June 2014 arrest on a warrant from the District of Oregon resulting from supervised release violations, DAVIS was staying at A.V.'s home.

26. Following these deposits (but before they had been identified as fraudulent), someone used BECU ATMs to transfer $2,300.00 from T.O.'s BECU savings account '5627 to T.O.'s BECU checking account '5630 and make two cash withdrawals totaling $1,480.00 from T.O.'s checking account. The funds transfer and first withdrawal for $480.00 occurred on September 4, 2013, and the second withdrawal for $1,000.00 took place the following day. I reviewed surveillance footage provided by BECU and identified DAVIS as the individual responsible for these transactions. BECU records also show that DAVIS used T.O.'s BECU debit card with the number ending '6106 and associated PIN to execute these transactions.

27. BECU investigator Mondala also interviewed T.O. about the activity in his accounts. T.O. stated that he was approached by a high school friend, T.S., who offered him money for use of his BECU bank card, PIN, and personal identifiers. T.O. stated that he was told by T.S. that doing so would not be criminal. T.O. stated that he did not know, nor had he ever met, A.V. and DAVIS.

28. BECU suspended T.O.'s accounts and ultimately closed them due to the suspected fraud. The total loss for these accounts due to the Bank Liq activity was $4,085.80. But because Wells Fargo Bank had not promptly acted to close R.A.'s account, it, and not BECU, bore that loss.

29.  At all times relevant to the allegations in this Complaint, Bank of America, Wells Fargo Bank, and BECU met the definition of a financial institution set forth in 18 U.S.C. § 20 because their depository accounts are insured by either the Federal Deposit Insurance Corporation or the National Credit Union Share Insurance Fund.

**CONCLUSION**

30.  Based on the above facts, I respectfully submit that there is probable cause to believe that CALVIN DEWAYNE DAVIS committed the offenses charged in this Complaint.

Michael Spiess, Complainant
Special Agent
United States Secret Service

Based on the Complaint and Affidavit sworn to before me, and subscribed in my presence, the Court hereby finds that there is probable cause to believe that CALVIN DEWAYNE DAVIS committed the offenses set forth in the Complaint.

Dated this 9th day of February, 2015.

JAMES P. DONOHUE
United States Magistrate Judge